Duncan, J.
delivered the opinion of the court.
This is a-novel and very extraordinary case. During its discussion, X must confess that I felt alarm from the great gravity with which the argument on the general question was put, and the zeal and ability with which it was argued by the counsel of the plaintiff in error, lest we should be compelled to give one of the most unjust judgments ever given in a court of justice; for it would be difficult for the warmest imagination to figure a claim more destitute of every colour of justice and equity, than, in reality, the demand of the present plaintiff is. Brushing from my remembrance, as far as it is possible to efface and overcome the unfavourable impressions which will be made from the survey of the whole transaction, and bringing to the consideration of the various questions that arise on it, a mind I trust free from all unjust prejudices, after a very full and anxious inquiry and deliberation, my understanding and my judgment are convinced, that, as it is void of all grace and decorum, so it is-unsupported by any principle of law, and in opposition to every sound principle of justice and good sense. This is the history of the transaction. [His honour here recapitulated the principal facts.]
The marriage by John Wilkins, in 1790, neither makes these children more nor less bastards. The father had a former wife living at their birth; the illegitimacy is clearly established. From the silence of the parties to this ceremony, and its secrecy, for it was known only to the justices, and, in 1803 discovered at his death by accident in his docket, we must conclude that secrecy was observed to give to the children the rank in society, which they would hold as lawful children, not subject to the reproach of bastardy.
The plaintiff now demands the surrender of this property, with all its valuable erections, of twenty times greater value than the naked lot, because, as he says, all the proceedings of the Orphans’ Court are null and void, founded in error and mistake; that nine years after he came of age, twenty years after the sale, he has discovered that his father had a wife in Ireland; that his father was guilty of adultery and bigamy, and that his mother was an unchaste woman, and he a bastard; and that he made a trip to Ireland, found out the just heirs, obtained a conveyance from them for the whole lot and buildings for less money than the three-fourths of the naked lot sold for, to pay his father’s debts, and support himself, his mother and sister, and put a building on the reserved fourth. He has fully established his own illegitimacy, and that the grantors are the lawful heirs of James M‘Pherson.
If the administrators had not asked by petition for a sale, but suffered what they otherwise could not have prevented, a sale on a *426 judgment and execution for the debts of decedent, all the lot must have been irretrievably gone. The balance, if any, after payment of the debts, would have come to the hands of the administrators, and they alone would then be accountable.
What gave birth to the present controversy was the discovery thus lately made of,the illegitimacy of those children; and the effect of that fact, which is clearly established, upon the sales, is the great question. As a great question it has been considered, and very ably argued, by the counsel on both sides, and it merits consideration, as a great and important question.
For it is now to be considered, whether all these proceedings, decrees of the Orphans’ Court, sales, and confirmations by the court,1 vast improvements made, titles derived, possession long continued on the faith of these decrees of the Orphans’ Court, a court of record having competent jurisdiction, are null and void, and that they are to be so decreed indirectly in ejectment, an original action, while these decrees remain unreyersed and in full force. There are minor objections — the want of adherence to prescribed formulae, and to certain ceremonial observances. These will be considered in the sequel so far as it may be deemed necessary to notice them. If the plaintiff fail to support (that which his counsel have properly considered as his strong hold,) the position, that all the solemn proceedings of this Court of Record, invested with chancery powers, conducted by chancery rules, and acting on and governed by the principles of a court of equity, are mere nullities, he cannot recover: — but if, as between the present defendant and the heirs at law of James ,M‘Pherson, they, as plaintiffs, could recover, it is an inquiry of great moment: — can this plaintiff, having acquired the title, have any status in curia from the relation in which he stands to the defendants ? That is, can they estop him, stop his mouth, when he opens it with an intention to proclaim his own bastardy, and on that ground defeat their title ? It must be constantly kept in view, that they do not claim title under the heirs of James MtPherson — their title is paramount. They say that the absolute descent to them is quo modo suspended until the debts of the ancestor are paid — that the descent is interrupted by the proceedings of the Orphans’ Court, and defeated by the judicial sale. There are legal and equitable estoppels. Legal, where the law estops a man to falsify a judicial act to which he is a party, and from which he has received a benefit; and equitable ones which will estop him from using a title which in good conscience ought to enure to the use of another. To give an example in the outset. If John MlPJierson had sold and conveyed this lot to another in the character of lawful heir of James, his father, and he is not his heir but a bastard; and, on discovering this, he purchased from the lawful heir, he never could recover. He would be estopped. There are legal estoppels, from the operation of *427 which Chancery would relieve, but here the want of conscience is, in setting up the bastardy.*
In general the law is, that the grantor is estopped by his own deed.to say he had no interest, when by a subsequent deed he acquires a title. As where an heir apparent, having the hope only of succession, conveys during the life of his ancestor, an estate, which afterwards descends to him, he is estopped to say he had no. interest at the time of his grant. These estoppels run with the land into whatever hand it comes. As if A. make a lease by indenture, of black acre, and after purchase and convey it to B.; B. is bound by this estoppel. Travannion v. Lawrence, 2 Salk. 266. These estoppels are founded in law, honour, and conscience, and the true reason is, that a man having received a benefit in one character, the value of the thing, shall not afterwards recover the thing itself, in another character. This legal and equitable principle runs throughout all the transactions and contracts of life. As in an action by the assignee of a patentee against the patentee himself, he is estopped from saying it is not a new invention, because he has received the benefit of it as such, and though all the world else may show this, he shall not be permitted to do it. The justice of this principle is stamped on every human breast, civilized or savage, the wild man of. the forest, and the civilized man in a social state.
Estoppel stoppeth the mouth of a man to allege or plead the truth by matter of record as by .letters patent, common recovery, pleading, confession, admittances, and acceptances; every act of a party where a Court of Record has jurisdiction estops him; for no man shall be permitted to make an averment against a record. When the record of the estoppel goes to the disability or legitimacy of the person, even strangers shall take advantage of the record. Co. Lilt. 352. (a) Loot, and Stud. 69. Two sue livery *428 as heirs, it is estopped between them so that one shall not bastardize the other, Br. Ab. JSsi.pl. 15; and it is there agreed, that in all records in which franktenement comes into dispute, it shall be estopped with the land, so that a man may plead it as a party, or as heir, or by que estate. Ibid. In law this is certainly so, but if a legitimate daughter, and her sister, a bastard, join in suing of the livery, this ought not to bar in equity, though it might estop at law. Carter’s Rep. 27. An entry by estoppel shall not be awarded in equity, nor is the jury bound to find it: and so the law seems to be in cases of obligations, covenants, and personal contracts; but where the estate is bound by the conclusion, and converted fto an interest, though it be found by a jury, yet the court shall judge, according to the law, that the estate is good by reason of the estoppel, Pollexf. 67. If the heir does not claim the land from him who made the estoppel, but by his own purchase, or by another ancestor, he is not bound by the estoppel, Id. 460. But here the decree and sale operated on the estate of the intestate, for by a sale made by an administrator by order of a judge of probate or surrogate for the payment of debts, the estate passes to the purchaser by operation of law, so that he is in the estate of the intestate; — the land descends, but the'interest of the heir is liable to be defeated by a sale made by administrators. Reed v. Williams, 7 Wheat. 114. Buckly v. Pollard, 20 Johns. 420. One of the reasons why estoppels are allowed is, that what once a man has alleged, is to be considered true, and he ought not to be permitted to contradict it, as in Willing et al v. Brown, 7 Serg. & Rawle, 407. One with whose privity, and under whose direction, on an execution against him, a marshall’s sale was made of an estate as his, shall not be permitted to contradict it; and what is, perhaps, more to the purpose, the doctrine of estoppel has been held with regard to acts in the Orphan’s Courts. The heir at law has been estopped by his acts, in this court, from asserting his right, and thereby converting real into personal property. Appeal to the Supreme Court, of John Anderson, Administrator of Christopher Griffith, deceased. 4 Yeates, 35. This estoppel is not unconscientious, depriving one of his right of inheritance, but it is where one qua heir has received the inheritance and conveys it, he shall not be permitted to receive it again, by falsifying the record, and denying his heirship, and keep the benefit which he has received in that character. It is a doctrine of legal policy, forbidding a party to a transaction to deny or falsify it, when he has received a benefit; an estoppel running with and working on the land. If James M‘Pherson is a party to the record, that which he has done so solemnly, and deliberately avowed, that, by means of which he was supported, he shall not be permitted to disturb. Infants are represented by the administrators, in these proceedings, as they are in case of valuation, by the guardian, who may accept, and bind his infant ward by a recognizance to any jamount. Gelbach’s Appeal, 8 Serg. & *429 Reticle, 205. Suppose all the children to have refused, and a sale made by an administrator under the order of the Orphans’ Court, which'might be — could John then have recovered from such purchaser ? But I am anticipating — this falls under another head.
Considering this sale as a proceeding in rem, to which all those claiming under the intestate are parties, my opinion is, that a chancellor would postpone the present plaintiff, and administering justice, as we do in this mixed forum of law and equity, that in this action of ejectment, which, with us is in the place of a bill in equity, he-ought not to recover. At law it would be an estoppel, which Chancery never would relieve against, for both law and conscience demand that he should be estopped. And it is the great excellence of a Court of Equity, that it may deny its aid where justice requires it, and lend it on such terms as it may think proper to .prescribe; and though I cannot myself discover any solid objection to that conclusion, yet it may seem to others, that it is stretching the doctrine of estoppel further than it has yet been done. I put the case on another ground, an impregnable ground, one which will disturb no man’s possession where it has been fairly acquired and long enjoyed, and where the defendants have so long reposed on that full faith and credit which the law bestows on all judicial tribunals acting within their proper sphere of jurisdiction, and on decrees under which so many estates are daily conveyed ; a ground, which, while it unsettles no former decisions, confirms to that most useful tribunal, the Orphans’ Court, the sanction which every court of record holds.
It is enacted by the act of 1713, establishing the Orphans’ Court, that the justices of the peace shall hold and keep a Court of Record in each county, which shall be styled the Orphans’ Court; and, by the Constitution, the judicial power of the Commonwealth is vested in a Supreme Court, in a Court of Oyer and Terminer, and General Jail Delivery, in a Court of Common Pleas, and Orphans’ Court, so that this tribunal is not only a court of record, but a constitutional court. By the 8th Sec. of the Act of 1713, it is provided, that the process to enforce obedience to the warrants, 'sentences, and orders, concerning any matter or thing cognizable in the said court, shall be by imprisonment, and sequestration, . as fully as any court of equity may or can do. Appeals lie from their decrees and sentences to this court; and the Orphan’s Court,- in matters within their jurisdiction, proceed on the same principles as a court of Equity. Guier v. Kelly, 2 Binn. 299. The principle on which I hold the sentence or decree of the Orphans’ Court conclusive is, that it is a general rule of our law, that where any matter belongs to the jurisdiction of one court so peculiarly, that other courts can only take cognizance of the same subject, incidentally and indirectly, the latter are bound by the sentence of the former, and must give credit to it. This deference is properly shown by those who have not the authority *430 directly, or ex professo, but only by accident and collaterally. It would be a great waste of' time to refer to the various decisions to support a position so undeniable, and a rule so universal; those who are curious to examine the subject, I refer to Hargrave’s Law Tracts, 451.
Such a sentence as the one we are considering is definitive-*— it passes in rem judicatam — the thing is finally judged, not without appeal, for that is given to this court; but we are not reviewing an appeal from this sentence, but, as a court of error, the decree of a court of Common Pleas, which had not a direct cognizance of the subject.
It is a proceeding purely in rem against the estate of the intestate,, and not in personam. So much is it a proceeding against his estate, that it overrules the lien of a judgment. The estate was condemned to a sale, and may well be compared to a condemnation of goods by a court of exchequer, whose condemnation is final in an action brought to try the right of the goods. Roberts Con. Bull. N. P. 244. Scott v. Shearne et al. 2 Wm. Bl. 977. The condemnation divests the property — I mean the title of deceased.
The sentence of a foreign court of admiralty, condemning property as prize, is received as conclusive evidence not only as to its direct effects, but also as to the facts directly decided by it. It required legislative alteration, and our legislature, by act 29th March, 1809, provided, ‘that no sentence, judgment, or decree of any court, exercising jurisdiction of prize, shall be conclusive evidence of any fact, matter, or thing, therein contained, except of the acts and doings of such tribunals;’ hut, well informed of the mischief of impairing the effect of the sentence on the property condemned, it carefully declares, ‘ that nothing contained in the act shall impair or destroy the effect of any such sentence on the property affected, or intended to be affected thereby; but the same shall be and remain as if the act had never been made.’ The matter which gives the Orphans’ Court jurisdiction, is the death of the owner* intestate, for if administration were taken out on the effects of a living man, or of one who died testate, the administration itself would be void, and there could be no administrator to act, no party before the court, consequently, all the proceedings would he null. Where an executor obtains payment on a probate of a void will, without suit, it c.annot be impeached, notwithstanding the probate was afterwards declared null, it being paid on the faith of the act of a judicial tribunal having competent jurisdiction. Toll. Ex. 51. The distinction in this respect is this: a probate of the will of a living person, or a letter of administration on his effects, where the person is dead, but left a will, is void ipso facto, because there is no jurisdiction; but where the person is dead, intestate, the Orphans’ Court have power over his estate, and any one acting on the faith of their judicial acts, will be protected in obeying them. *431 The well-known distinction between erroneous acts, or judgments of a tribunal having cognizance of the subject matter, and of a,tribunal having none such, is illustrated in Griffith v. Frazer, 8 Crunch, 25. That was a case of the sale of a real estate on a judgment against an administrator durante absentia of an executor. It was there decided, that the sale was void, because the administration was void ab initio, and the validity of the sale rested on this,' whether the defendant was administrator or not of the debtor; it was ruled he was not, and that being void, all the acts' were void; and the chief justice put, by way of illustration, the case of administration to a living man. — This is totally void; it was not within the jurisdiction of the ordinary; it was hot committed to him by law; it was a case in which he had no right to deliberate ; no one representing the estate was in the case, or before the Court; consequently, their judgment did not bind that estate. But if there had been a real though erroneous judgment, which would justify the sheriff in levying on the land, the sale would have been good; but the execution issued on a judgment, that was a nullity. Now, the order of sale would justify the administrators, they would not be wrong-doers in entering and making sale on the premises.
These rules would apply more properly and peculiarly to sales by order of the Orphans’ Court, than to the various instances to which they have been applied. It is a common and usual mode of sale; fewer sacrifices are made than at sheriffs’ sales, and they are less expensive, with an equitable power in the court to confirm or reject them as justice may require, proceeding, as this court always does, on principles of equity. But it never could be imposed as a duty on the purchasers at the end of twenty years, to prove the observance of every direction of the acts; as, for instance, who put up the advertisement; it never can be that the title of a fair purchaser should depend on such perishable testimony.
If (and it is the best and fairest guide,) it is to be considered, as it would be if the Orphans’ Court were a court of Chancery, and had made this decree, and a fair sale had been made, and the decree executed by a conveyance from the administrators, would the purchaser be bound to look beyond the decree, if the facts necessary to give the court jurisdiction appear on its face, that is, that there are debts, children to maintain, and not sufficient personal estate for both these purposes ? If such a purchaser is not protected, then, as was said by the Lord Keeper, in Windham v. Windham, 3 Ch. Rep. 12. where a like attack was made on a sale under, decree of a court of Chancery, ‘ you blow up with gun-powder the whole jurisdiction;’ and here, if the protection be denied to honest purchasers, you lay a train of gun-powder through the whole state, and this decision would be a signal to set fire to it; — for nothing has .been more irregular than the practice of these courts generally; there may be exceptions, but they are very rare, These *432 orders depend on loose scraps of paper deposited in untitled pigeonholes, or packed up as useless lumber in old trunks 5 and when to this, is added, and it is a sore evil, their transmission from hand to hand, as the clerks of these courts are moved off the stage in rapid succession, this would render this species of title so precarious and insecure, that if, at the end of thirty years, or perhaps snore, the purchaser was bound to produce every inventory, statement, or return of sale, no man, no prudent man, would buy at such sales. In some counties I would not take fifty per cent, to seeure the purchasers. Nothing so much requires legislative attention as the proceedings in the Orphans’ Courts, for as sure as we descend into our graves, so sure into this court we must come; and the man would be a real public benefactor who would devise set forms, and furnish directions in conducting the vast business in these courts, where we every day find so deplorable a system of confusion.
Whenever the sales are called in question, we find the courts declaring, that these irregularities must be overlooked; after a lapse of years all must be presumed to have been solemnly transacted; presumptions made in favour of what does not appéar. Messinger v. Kintner, 4 Binn. 105. The presumption always is, that they are regular, and it lies on the party impugning them to show their irregularity. So far even has liberality been carried, that parol evidence was received of a sale which had not been returned. Rham v. North, 1 Yeates, 118; and Mr. Justice Yeates, with an experience of fifty years in the business of the Orphans’ Court, and whose knowledge of the mode of conducting it was greater than any one man living or dead possessed, in Snyder’s less. v. Snyder, 6 Binn. 496, exclaims, £What! shall purchasers be affected by the unskilfulness or negligence of the proper officers ?’ A substantive compliance only with the act is required. If it appears, on the facts disclosed, to the Orphans’ Court, that the debts cannot be paid, and the children brought up, without selling the had, and they are fully satisfied on these points, their power is called into full exercise. The court in this instance was fully satisfied of these facts. If the purchaser was responsible for the mistakes of the court in point of fact, after they had judged on the facts, and acted upon them, these sales would be snares for honest men. Where there are debts, as it is not denied but that there were, the administrators represent the real estate, and the purchaser holds the land, sold by order of the Orphans’ Court, discharged of the lien of the judgments against the deceased. 4 Dall. 119. The proceedings are always against the administrators to compel a judicial sale, and never against the heir or terre* tenant. 1 Yeates, 238. 1 Peters’ Rep. 273. 2 Serg. & Rawle, 377. 2 Cranch, 458. The surplus, after discharging the judgments, goes into the administrator’s hands; payment to him is good, unless notice be given to the sheriff, and the money ordered
*433 to be paid into court. If the order of sale is to be considered as a proceeding in Chancery, which I think it is, the petition of the administrator is considered as a bill in. Chancery, in which, by the Act of Assembly, he is the sole pariy representing the estate. It is very important to see ho\v purchasers, under an order of sale by a court of Chancery, stand, where sales can only be resorted to, for payment of judgment creditors, in default of personal estate. There the heir is the party, the administrator representing the personal estate. A purchaser under the decree is never affected by even a palpable error in the decree, e. g. in not giving day to a judgment creditor, to show cause, or in directing too much to be sold, .or in decreeing a sale to satisfy judgment debts without an account of the personal estate. On a full examination of the chancery authorities, without going through a tedious detail, this is^very much the doctrine and the language of the chancellors. A purchaser 8 not bound to look into all the circumtanees, nor to go through all the proceedings, from beginning to end. On the contrary, the general impressions the decisions give, is this, that a purchaser has a right to presume that the court have taken the necessary steps to investigate the rights of the parties, and that it has, on that investigation, properly decreed a sale. Then he is to see that all proper parties are before the court; and he is further to see, that in taking the conveyance, he takes a title that cannot be impeached aliunde; and he has no right to call on the court to protect him from a title, not at issue in the cause. Although the decree may be erroneous, the title of the purchaser ought not to be affected. And why? Because, as the chancellors say, it would introduce great doubts in sales made by the authority of that court, which would be highly mischievous. This is the present doctrine of the court of Chancery, but the principle is not modern. In Kitely v. Lamb, 2 Ch. R. 405, where a bill was filed, praying, that a sum of money in the hands of a trustee, might be laid out for the benefit of the plaintiff, the bill was dismissed, and the decree of dismissal signed and enrolled, after which, the trustees paid the money to the other party who had claimed it. On a bill of revivor, that decree was reversed, yet the court determined, that in regard they had relied upon the dismission, signed and enrolled, they were indemnified thereby, and that the plaintiff should be put to seek his m'oney against the person to whom the trustees had paid it, on. the ground that whilst the judgment remained in force, it barred the right, and justified the parties, though they paid it voluntarily, and without suit. The purchaser is not bound to see further back than the order of the court; he is not to see whether the court was mistaken in the facts, of debts, and children; his contract is, in truth, with the court; and, in fact we must come to the point, that the purchaser has as little to do with the irregularities of-the proceedings, as if it had been a sale for a debt of the intestate on a judgment against the administrator, by the sheriff hold *434 inga venditioni exponas, in which case, though the debt has been paid, and nothing was due, still the defendants, or the heirs of the intestate, have no right against the purchaser. A stranger to the proceedings, could not be permitted to prove that fact, or if he did prove it, or if the judgment was reversed for any error, could it affect the purchaser ?
Nothing would create a pause in my mind, or hesitancy in my judgment, unless it be the reluctance I should feel in overturning former decisions. I know an impression has prevailed, that these irregularities can be inquired into in ejectment, and some dicta, at Nisi Prius, are found in the books, to favour that impression. A very eminent judge of the present day, has said, that he wished there had never been a Nisi Prius case reported ; and surely our .decisions ought not to be governed by them, unless, by a sesíes of determinations they have ripened into law; and if they are not supported by law and reason, tho eonveniencé of mankind requires that our decisions should not be governed by them. One thing-1 may venture to assert without the hazard of contradiction, that there has been no solemn determination by this court, of this very question; I therefore consider it as an open one. No sale ever has been declared void, in ejectment against a purchaser Iona fide, for any of the alleged irregularities, or because the decree of the court was founded on a mistake. The case of Larrimer v. Erwin was at Nisi Prius, and the report of that case warns us against confiding in these decisions. I have a proper respect for judicial decisions where it is clearly ascertained what they are, but where they depend on memory or such indistinct evidence as to leave it doubtful, they have with me little weight, when they are at variance with the soundest principles of policy and justice. The chief justice cited it in Messenger v. Kintner, and, as afterwards explained by him, in Huckle and Wife, v. Phillips, 2 Serg. & Rawle, 7, the court did not rely solely on the non-settlement of the accounts, but on the circumstances, particularly on this, that before the purchaser had paid his money, the administrator had settled his account, by which it appeared, there was a surplus in his hands after payment of all debts; and Mr. justice Yeates treats that case with little regard. He says, in Snyder v. Snyder, 6 Binn. 497, ‘ if that decision were, that a sale was void, merely because an administration account had not been .settled, he could not assent to it. Nineteen out of twenty sales would be rendered void, should the doctrine be established.’ And with strong emphasis he asserts, “ that the decree of an Orphans’ Court, in a case within its jurisdiction, is reversible on appeal, and not collaterally in another suit.” In Messenger v. Kintner, the court did inquire into the proceedings of the Orphans’ Court, because there they considered the decree as a mere nullity on its face. It purported to be the partition and valuation of a man’s lands; it was a proceeding against his estate, and not the estate of his *435 father, in which he was alleged to be bound by proceedings unsanetioned by law or justice, where neither he, nor his guardian, or next friend was a party; it was' all coram non judice, and tainted with fraud, which would vitiate the most solemn acts. I do not quarrel with this decision — it does not come in my way. When the decree in Fullerton’s Case, *at Nisi Prius, at Chambersburg, was assailed on the ground, that there were only debts, and no younger children, it was sustained; 4 Dall. 451, 4 Yeates 523, and in Rham v. North, before Yeates and Smith, justices, at Nisi Prius at Harrisburg, where the order required no return of sale, and none was made, a sale proved by parol was supported ; and so in Huckle and Wife, v. Phillips, 2 Serg. & Rawle, 4, a decree of sale on the ground of maintenance of a child only, was held good, although there were former sales for payment of debts; and in Bickle v. Young, 3 Serg. & Rawle, 234, where the whole proceedings and sale were conducted in the name of one administrator only, when there were two, and in Snyder v. Snyder, the same objecjection was made and did not prevail. These are all the reported cases, and yet the purchaser has been hitherto protected except in Larrimer v. Irwin, the circumstances of which are not stated. In the case of Davis v. Huston, 2 Yeates, 289, the lands of the intestate had been valued under a decree of the Orphans’ Court, and taken at the valuation by a putative daughter, and sold by her, and the purchaser set up her illegitimacy as a defence against the payment of the purchase money, and this defence prevailed. There was in Messenger v. Kintner, a proceeding against the estate of the heir, and not of the ancestor; and in fact it was a controversy between the legitimate and illegitimate child, and against such estoppel, we have seen from Carter’s Reports, equity would relieve. It is true, that the chief justice, in Snyder v. Snyder, spoke of a long practice of inquiring into these proceedings in actions of ejectment, acknowledging its inconvenience. So far as these irregularities go to show a fraud, or to corroborate other proof of a fraud I agree. Mr. Justice Yeates took a view of the subject which meets my assent and -approbation, and I cannot give his-conclusion better than in his own words. “ I consider the general remark to be correct, that the decrees of the Orphans’ Court, in. a case within their jurisdiction, is reversible only on appeal, and not collaterally in another suit. The settled rule is, that the merits of a judgment can never be contested in an original suit either in law or equity, 2 Burr. 1009. The maxim is de fide et officio judiéis non recipitur questio. Hard. 127. The defendant in error in Messenger v. Kintner, a minor, somewhere about nine years of age, was attempted to be bound by proceedings unsanctiorned bylaw and justice, to which neither he, nor his guardian, or next friend, were parties ; it was res inter alios acta, and no, presumption could be made in favour of what was done. I assimilate the present case, to a sheriff’s selling land which he *436 has taken in execution by process of law. The judgment concludes all irregularities in the previous proceedings, except where the plaintiff in the execution becomes the purchaser, Goodyer v. Junce, Yelvert, 79; but- the sale must be fair and just, uninfluenced by threats or violence. Here the lands have not been aliened by the first purchaser, but remain in his children, whose guardians have leased to the defendant. The true merits of the case rest on the honesty and fairness of the public sale, and may be fully contested in the present suit.” 6 Binn. 499. It gives me additional confidence in the opinion I have formed, to find the chief justice in considering the question again, in Selin v. Snyder, 7 Serg. & Rawle, 166, which was the same as Snyder v. Snyder, new parties being added, declaring, “that the Orphans’ Court were acting within their jurisdiction. They had power to receive and grant the order for the sale of John Snyder’s estate, and therefore what is averred on the record cannot be contradicted. The sale may be avoided if unfairly made, but the assertion in the record, that the parties appeared in court, must be taken to be an absolute verity.” “ The purchaser is bound to look to the jurisdiction of the Orphans’ Court, and, in some instances, the validity of the proceedings has been contested in the courts of common law. But the truth of the records concerning matters within their jurisdiction cannot be disputed.” And-again, in the Supreme Court at Philadelphia, in December last, in Kennedy v. Wachsmuth, he repeated this well settled principle. The court has here decided, that there were debts, and children to support, and no personal estate to pay the debts, and support the children, and on that state of adjudged facts they decree a sale; Beyond the decree, the purchaser is not bound to look. The inquiries upon an ejectment are: Was there an administrator,' and order to sell, such as would authorize the administrator to make sale; was the sale fair? The irregularities or ■ mistake of facts after sale confirmed, money paid, conveyance executed, possession for twenty years, improvements of twenty times the value of the property, fair purchasers deriving the title by subsequent conveyances, cannot affect the purchasers. These objections, on the return of the sale, might and probably would have been sustained by the Orphans’ Court; but these and all the other errors noticed by the counsel of the plaintiff in error, ought not to overturn these fair and honest proceedings and sales. I have not concluded it necessary to go into detail on the’various errors assigned. The present opinion in its general scope embraces the whole of them, and though there may be some abstract opinions of the court, to which I cannot accede, yet, as in the main the charge is right, there can be no reason for reversingthe judgment. If there were irregularities as to the advertisement, that was error of judgment of the administrators. Where there was no fraud intended, and where the proceedings were intended to be fair and regular, they ought not, after the confirmation by the Orphans’ *437 Court, and so long an acquiescence, 'to be overthrown, to the injury of subsequent bona fide purchasers.
It was insisted that whatever might be the fate of the first sale, the second was clearly void. I cannot distinguish them. The act of 1794, under which they were made, provides that the Orphans’ Court may from time to time order sales, for payment of debts, maintaining the children, and improving the residue. The purpose is joint; if the first does not produce a sufficient sum for all the purposes,, the order may be renewed until all the purposes are satisfied; all will be considered as one transaction, and this was decided in Huckle and Wife, v. Phillips.
The doctrine I advance is, that where there is a direct sentence on the very point, such is to be received as conclusive evidence, not to be impeached fi’om within, but like all other acts of the highest judicial authority is impeachable from without; and though it is not permitted to show that the court was mistaken in th© original action, it may be shown that they were misled by some collusive aet between the parties,* and this was decided by the opinion of all the judges in England, in the duchess of Kingston’s trial in the house of Lords. 9 State Trials, 268. Collusion being a matter extrinsic of the cause, may be gone into by a stranger and tried by a jury. It might be here inquired into, whether there was collusion between the administrators and the first purchasers in obtaining this decree;’ but that is not pretended. There is a common mistake of all, at least of one of the administrators, of the court, and of the purchasers — a mistake arising out of an unknown fact which took place in a foreign country. A man is chargeable for goods sold to a woman, whom he represents as his wife, though they are not in fact married.
One more authority I add, Commonwealth v. Greenwood Turnpike Co. 1 Cont. R. 1. 7. Turnbull, justice, in delivering the opinion of the court, said, “ a judgment, decree, sentence or order, passed, by a competent jurisdiction, which creates or changes a title or any interest in estate, real or personal, or which settles and determines a contested right or fixes a duty on one of the parties litigant, is not only final as to the parties themselves and all claiming under them, but furnishes conclusive evidence to all mankind, that the right, interest, or duty, belongs to the party in whom the court adjudged it.” The Orphans’ Court had authority to direct the administrators to mortgage for payment of 'debts, and support of children, not exceeding one third the value of the estate. Now, if instead of a sale, money had been taken upon mortgage, fairly applied by the administrators, could it be endured, that the mortgagee should lose his money, advanced on the faith of a decree to which all are bound to give credit, because it afterwards turned out in point of fact, that the intestate had a wife in Ireland, and his children were illegitimate, and that, though there were debts to pay, of the intestate? No honest and intelligent man, lawyer or *438 layman, would hesitate to give an answer; that answer would be, justice forbids this. If it were not that some former decisions, at Nisi Prius, had mutilated the uniformity of the law, relating to decrees for sale, — sales executed, and confirmed by the court, would be sustained, according to the universal rule governing the sentences of every court of record, when acting within its jurisdiction. The determination of this court, in the recent case of Selin v. Snyder, has restored the law, by declaring, that testimony shall not be received to contradict’the record. The error assigned was not a mere formality, but a vital objection, a charge that the proceedings were conducted against the consent of the administratrix, the mother of the children of John Snyder. It is impossible to distinguish; the cases in principie are the same, for if it were perxnitted to falsify in uno, it would be permitted to falsify in omnibus. The strongest possible case is that cited in 10 Vin. Tit. Record C. pl. 2. from Br. E.pl. 78. “ Record of outlawry of divers persons, was certified in the exchequer, among whom, one was certified outlawed, and was not outlawed, and that his goods forfeited, were in the hands, of I. N. and upon process made against him, he came and said he was not outlawed ; and parcel of the record came by chancery, out of B. R. into the exchequer; and Green, justice of B. R. came into the exchequer, and' said he was not outlawed, but that it was misprision of the clerk. Skipwith said, Though all the justices would record the contrary, they shall not be credited, when we have recorded that he is outlawed. Quere: What remedy is for the party ? It seems it is by writ of error, inasmuch as there is no original against him, but only record of outlawry without original. Br. Record pi. 49. And in the same book, pi. 4. cites Br. Err. pl. 78, it is said, the diversity is this, that a man may assign error on a thing separate or out of the record, but he cannot falsify it.” The decision in Selin v. Snyder, impresses the decree with the seal of inviolability, where a fair and bona fide purchaser claims under it, where it was a duty for the court to decree and where the decree states such facts, as .give the court authority to make the order of sale. Cases of individual hardship may arise from adhering to this principle, but the old maxim of law is, that a private mischief shall be rather suffered, than a public inconvenience, and this is applied to all public sanctions in government and legislation, and it never can be more safely applied, than to the sanction of judicial sales ; and if these purchases are not protected, but remain open to inquiries as to the regularity and exactness of the proceedings of this tribunal, this useful power will be disused, and, in time, abolished. I have stated what I conceive to be the legal and fundamental rules of property, and if the question was to be decided, by appeal, to plain common sense, its verdict would be the same as the judgment of the law. On the view I have taken of this case, I have not thought it necessary to dwell much on the minor objections; *439 they are absorbed in the great question; the final decision of the cause rests on that, and it is of consequence it should so rest. All others sink into insignificance, but the great question of the conclusiveness of these decrees for sale by order of the Orphans5 Court, required an unequivocal determination. It is one on which, the title to so many estates depends, that it could not without great mischief and inconvenience be postponed, and it would be unworthy to evade it; it is on that ground also I wish to be distinctly understood that the judgment is affirmed. I consider the rule as one of the indelible land marks of property, invariably established by the well-weighed policy of the law,' and has stood the test of ages, founded on the great principle of public convenience, and necessity, and ought not to be shaken by any accidental mischief to an individual, which occasionally will occur from every general rule. This, like other general principles, may produce disadvantages unjustly to an individual, but it is on this condition that general rules are adopted; partial inconvenience is the inevitable consequence, but the production of general good authorizes the establishment; ‘ partial evil is universal good.5 But the hardship, if considerations of hardship, ought ever to mingle in the administration of justice, would fall on the defendants. The Irish heirs never dreamed of this inheritance, it was to them totally unexpected, they never calculated or acted upon it as a right which might descend on them, it was a mere windfall, as little looked for, as the descent of the imperial crown on their heads, and as much a surprise; to them it would be no disappointment. But the defendants have laid out the labour of their lives upon it, have looked up to it as their support during life, and a provision for their children on their death; they have considered it as their own ; all their plans and habits of life have been formed in the full belief of enjoying that which they had fairly acquired on the faith of a judgment of a court having authority. And, as it respects the present plaintiff, what grievance has he to complain of, except the baffled expectation of an iniquitous speculation, and except that he is not suffered to sell the very hands that fed him, and is disappointed in the premium he expected from stigmatizing publicly his mother, and defiling his own nest? It maintained and educated him, it supported his mother and sister; and the reserved part of the lot, rendered valuable by the money of the defendants, he still enjoys — he holds the worth of his money! One thing is very plain, that, either the real value was concealed from the Irish heirs, or they, from a sense of justice to the purchasers, or humanity to the plaintiff, parted with it for its value as it stood at the death of the intestate. If the state of improvements had been communicated to them, then they conveyed to him as the natural heir, or as trustee for the purchasers. Considerations of hardship are of little value ; courts of justice do not sit to inquire how the loss of property may press on this individual, or that, who has held it *440 without title. The usual subject of consideration for the court, is, whether it has been held without title, and if they find that it has, to restore it without delay, to the right owner. There is nothing of conscience in his claim, and the law is against him.
This opinion I háve formed after long and repeated consideration. I have explained the ground of it I fear, with too much prolixity, and perhaps, have repeated too often the same thing, but public duty required a deep investigation, and full explanation of the subject. The justice of the ease is so clearly with the defendants, that it would be incumbent on the plaintiff, who wishes to establish a rule contrary to justice and equity, to produce some well-established authority, showing, that there is an inflexible rule of law, in opposition to justice. He has failed to do this, for the invariable rules of law, and the justice and equity of the particular ease, are in exact and happy conformity.
Judgment affirmed.
Since the opinion was drawn up, I find in 1 Vol. of the Reports of Nott 8? M‘ Cord, of Cases in the Constitutional Court of South 'Carolina, 329, that the decree of the court of ordinary, revoking the probate of a will, was held to be the judicial act of a court possessing jui'isdiction over the subject matter of dispute. And the law holds the exercise of this right so sacred, that no evidence will be permitted to contradict it in relation to the subject in dispute, so long as it remains unreversed by the superior tribunal; and this can only be done by appeal to the Common Pleas, according to the act of assembly. And in Waters v. Woodward, same page, an existing judgment or decree of a chancery court, upon a matter within its jurisdiction is conclusive of the right of the parties in any other court of concurrent jurisdiction ; nor do the decrees of a court of equity form any exception to the general rule. Sitting in a court of law, judges are not at liberty to enter into the examination of the justice or injustice of the decree of a court of competent jurisdiction. " Unless it comes before them on a writ of error or appeal, it must stand until reversed by a court of competent authority to review it. In Scott v. Hancock, 13 Mass. 162. under a similar proceeding, Jackson, justice, said, “ these orders of sale by administrators affect the inheritance, and if we should order the'sale as prayed for, by the administrator, we should decide these questions conclusively against the heirs, who would be disinherited to the extent of what should be sold under the order, without any trial of the fact by a jury, (and without any opportunity of reviewing the judgment by writ of review, writ of error, or in any other manner.” The claim of the ci’editors is paramount to any title that could be acquired after the death of the testator. And in Moers v. White, 6 Johns. Ch. Rep. 384. Chan. Kent, entirely approves of this doctrine, of the conclusiveness of an order of sale, and refers to Read v. Williams, 7 Wheat. 60, before cited, and ob *441 serves, that the validity of the order of sale was not questioned, because it was the order of a competent court of peculiar and exclusive jurisdiction; and it was an extraordinary and monstrous case. Letters of administration were granted after the lapse of 28 years, and the right to sell, after the lapse of 31 years from the death of the intestate, yet the decree of the court being res judicata, it could not be questioned in a collateral action. Thus, we see how the question stands by the law of England, and our sister states, New York, Connecticut, Massachusetts, and South Carolina. The extent of real property, that-must be in the course of 20 years, transmitted by this mode of sale is immense, and the number of persons, through whom that property passes is inconceivable. Can it be then, that a matter decided by the Orphans’ Court, a court of peculiar jurisdiction, shall be controverted at the end of any given period, and that a latent claim, which no man of intelligence could foresee — known to no one, or if known, concealed, should be put in operation, by an heir, and sweep away the labours of a life-time, and that because the tribunal appointed by the law to decide, had erroneously found a fact on prima facie evidence, as the cohabitation here was, and then without notice, or the means of notice, the decree of the court should be disputed after such long possession ?
As the doctrine of the law, I hope I have satisfactorily shown it shall not.
Tiluhman, C. J. was absent, in consequence of sickness.

 Chancellor Kent, in Vanhorne v. Fonda, 5 John. Ch. Rep. 388, states a principle in Equity strongly applicable to this case. Admitting- that one tenant in common, may, in a particular case, purchase in an outstanding title for his own benefit, yet, where two devisees are in possession of land, under an imperfect title, derived from their common ancestor, one of them cannot buy an outstanding adversary title to deforce and expel his co-tenant, for such purchase will inure to their common benefit, subject to an equal contribution to the-expense. The reason holds equally in the law — it is not consistent with good faith, nor the duty which the state of the parties as claimants of a common subject created, that one of them should be able, without the consent of the other, to buy in an outstanding title, and appropriate the whole to himself, and thus undermine his co-tenant. It would be an unusual act, repugnant to a sense of refined and accurate justice. It cannot be tolerated in a common subject, in which the parties had an equal concern, and which created an obligation to deal candidly, and honestly, with each other. Communityof interest produces a community of duty, and there is no defence on the ground of justice and policy where one co-tenant buys an outstanding incumbrance, or an adverse title, to deforce and expel the other. Here, to be sure, the estates were separate, but they all were derived from the same source, James M‘Pherson, now, long enjoyed under the same title, and the equity of the purchasers against the plaintiff is stronger than the case of co-tenants.